Laroche v. Vose                          CV-97-409-JD   06/23/98
                 UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE

David F. Laroche

        v.                              Civil No. 97-409-JD

George Vose

                              O R D E R


     On July 21, 1997, the petitioner, David F. LaRoche, brought

this petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 against the respondent, George Vose, the Attorney General

of the state of Rhode Island.   The gravamen of the petitioner's

claim is that his conviction violated his due process rights

because he was convicted for engaging in conduct that he lacked

clear notice was criminal.   Before the court is the petitioner's

request for a writ of habeas corpus (document no. 1).


                          Background[1]

     The petitioner is an entrepreneur who "fell prey . . . to

the devastating financial upheavals created by the October 1987

_____

        [1]The court summarizes the relevant background information.
A more detailed factual recitation is set forth in the opinion of
the Supreme Court of Rhode Island denying the petitioner's direct
appeal.  See State v. LaRoche, 683 A.2d 989 (R.I. 1996).  Because
the petitioner has presented only a legal challenge as to his
conviction, the court accepts the facts relating to the
petitioner's conviction as set forth in that opinion.  See 28
U.S.C.A. § 2254(e)(1) (West Supp. 1998) (presumption of
correctness of factual determinations made by state court); see
also infra note 4.

stock market crash."  State v. LaRoche, 683 A.2d 989, 991-92 (R.I. 1996).  In an effort to keep his foundering financial affairs afloat, he used straw borrowers to obtain loans from credit unions that he was unable to obtain in his own name because of the institutions' lending limits.[2]  As a result, he was convicted on two counts of obtaining money by false pretenses and three counts of conspiring to obtain money by false pretenses on July 6, 1993.  The Rhode Island false pretenses statute provides, in relevant part, the following:

> Every person who shall obtain from another designedly, by any false pretense or pretenses, any money, goods, wares, or other property, with intent to cheat or defraud . . . shall be deemed guilty of larceny.

R.I. Gen. Laws § 11-41-4 (1956).

The petitioner was convicted on charges stemming from three different transactions, all involving the same modus operandi, directed at two different financial institutions, the Davisville Credit Union ("Davisville") and the Rhode Island Central Credit Union ("RICCU").  The first transaction, known as the "Sherwood property" transaction, resulted in the petitioner's conviction on one count of obtaining by false pretenses, and one count of

---

[2]The lending limits, which at the time represented the internal policies of the credit unions and since have been statutorily enacted, cap the amount that any individual can borrow at a fixed percentage of the credit union's net worth. The lending limits were established by the institutions' boards of directors.

conspiring to obtain by false pretenses, a $1.4 million loan from Davisville in August 1988. The petitioner wanted to repurchase the Sherwood property, which he had previously sold to a business associate to whom he owed money on the assumption that it would increase in value. When it did not, he agreed to buy it back but needed to take out a loan to do so.

First, however, the loan had to be approved by the loan committee. At the time, the lending limit at Davisville, as set by the board of directors, was approximately $1.9 million and the petitioner had already borrowed about $1.6 million. Under those circumstances, the loan committee would not approve the loan. To circumvent this obstacle, he offered to give a friend, P. Alan Ryan, $50,000 if Ryan would take out the loan from Davisville to cover the amount necessary. The petitioner discussed his plan with a branch manager and a vice president at Davisville, each of whom approved of it. The two were on the Davisville loan committee and recommended the loan to the committee but failed to disclose to the rest of the loan committee or the board of directors the true nature of the transaction. The loan committee approved Ryan's application, Ryan obtained the loan, and the petitioner obtained the benefit of the funds.

The second transaction, known as the "Tower Hill" trans-action, resulted in the petitioner's conviction on one count of obtaining by false pretenses, and one count of conspiring to

3

obtain by false pretenses, an $800,000 loan from Davisville in June 1988.  Bernard Roy Dutra, a friend of the petitioner, obtained the loan at the petitioner's request to purchase Tower Hill from the petitioner.  Dutra granted the petitioner an option to buy the property back at the same price and never intended to repay the loan himself.  The true nature of this transaction was known not only to the two Davisville officers who were aware of the Sherwood property transaction but also to Davisville's president.  Again, each of the three credit union officials with knowledge of the true nature of the transaction failed to inform the other members of the loan committee or the board of directors and the loan was approved.

The third transaction, known as the "Richmond trailer park" transaction, resulted in the petitioner's conviction on one count of conspiring to obtain by false pretenses a $1.92 million loan from RICCU in December 1988.  For this loan, RICCU's president recommended that the petitioner use a straw borrower to obtain the loan because the petitioner was too close to his lending limit at RICCU and the loan could not be approved in his name. The petitioner had David Ryan, the brother of P. Alan Ryan, apply for the loan.  The petitioner obtained the proceeds by "selling" the Richmond trailer park to Ryan.  Again, the loan committee was not informed of the true nature of the transaction.  Ryan testified at trial that he had no personal interest in owning the

4

Richmond trailer park and took out the loan "to help" the petitioner.  LaRoche, 683 A.2d at 994.

The three transactions had the effect of refinancing the properties in question and allowed the petitioner temporarily to shore up his collapsing financial position.  As the value of his assets deteriorated, however, he was ultimately unable to service the loans.  He testified at trial that he did not believe that he had done anything wrong.  The trial court stated its opinion at sentencing that it believed the petitioner on this point.  However, it allowed his conviction to stand because it found that the evidence, taken in the light most favorable to the conviction, was sufficient to allow the jury to conclude beyond a reasonable doubt that the petitioner had obtained the loans by false pretenses with the intent to defraud.  See id. at 995-96.

Subsequent to his conviction, the petitioner appealed to the Supreme Court of Rhode Island.  See id. at 991.[3]  One of several arguments presented by the petitioner in his appeal was that his conviction violated due process because he lacked notice that his conduct was criminal.  However, the court did not address that argument in resolving his appeal.  See LaRoche, 683 A.2d at 991-1001.  Despite the court's failure to address this argument, the

_____

[3]The petitioner also sought post conviction relief from the trial court on the basis of newly disclosed facts.  The trial court denied the motion on May 22, 1997.  The petitioner did not appeal this decision.

5

petitioner's presentation of the argument to the court satisfied the requirement that he exhaust his state court remedies before seeking habeas relief. See, e.g., Nadworny v. Fair, 872 F.2d 1093, 1097 (1st Cir. 1989).

## Discussion

The enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1217 (1996), on April 24, 1996, significantly altered the prior framework governing habeas corpus petitions. The AEDPA amendments apply to this petition filed on July 23, 1997. The relevant amended version of 28 U.S.C. § 2254 provides as follows:

> (a) [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> . . . .
>
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C.A. § 2254 (West 1994 & Supp. 1998).

6

At the time this petition was filed, the First Circuit had not addressed the question of how the new § 2254(d)(1) standard of review was to be applied.  On May 26, 1998, however, the First Circuit declared its interpretation of the standard in O'Brien v. DuBois.  See ___ F.3d ___, No. 97-1979, 1998 WL 257206 (1st Cir. May 26, 1998).  As the O'Brien court held, pursuant to AEDPA:

> A federal habeas court charged to weigh a state court decision must undertake an independent two-step analysis of that decision.  First, the habeas court asks whether the [United States] Supreme Court has prescribed a rule that governs the petitioner's claim.  If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule.  In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step.  At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of [United States] Supreme Court precedent.

Id. at *7.  The First Circuit went on to note, as follows:

> [A]n affirmative answer to the first section 2254(d)(1) inquiry -- whether the Supreme Court has prescribed a rule that governs the petitioner's claim -- requires something more than a recognition that the Supreme Court has articulated a general standard that covers the claim.  To obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court.
>
> We caution that this criterion should not be applied in too rigid a manner.  A petitioner need not point a habeas court to a factually identical precedent.

Id. at *8 (citation omitted).  It also provided:

> If no Supreme Court precedent is dispositive of a

7

> petitioner's claim, then, <u>a fortiori</u>, there is no specific rule to which the state court's decision can be "contrary." In such circumstances, a federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence. This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable.

<u>Id.</u> at *9. This second standard is a higher one, because "for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." <u>Id.</u>

One important question not answered by <u>O'Brien</u>, however, is how the court is to treat the failure of a state court to address an argument raised by the petitioner. In this case, the court holds that the structure presented by <u>O'Brien</u>, despite its failure to explicitly address this situation, is broad enough to encompass it. The mere failure of a state court to address an issue, particularly in the context of a direct appeal where numerous other issues are raised and addressed in detail, is not itself "so arbitrary[] as to indicate that [the decision not to address an argument] is outside the universe of plausible, credible outcomes." <u>Id.</u> Under the circumstances, the only reasonable interpretation of the Supreme Court of Rhode Island's failure to respond directly to the petitioner's due process argument is that it rejected the merits of that argument. To

8

justify habeas relief, therefore, the issue raised by the petitioner must be subject to O'Brien's two-step analysis to determine whether that court's implicit rejection of his argument justifies the grant of habeas relief under § 2254.

The petitioner has put forth a single legal argument in support of his petition. He contends that his conviction violated his due process rights because he lacked adequate notice that his conduct was criminal.[4] In support of this argument, he asserts that he was doing nothing more than structuring transactions, which is not itself illegal. He contends that the lending limits were, at the time of his offenses, only the internal policies of the credit unions and that even the subsequent statutory enactment of them did not impose any burden or obligation on borrowers, but only on lenders. He claims that

---

[4]The petitioner's argument, although presented as a due process challenge to the false pretenses statute, also appears to encompass an implicit assertion that the state adduced at trial insufficient evidence that the petitioner intended to defraud the credit unions to support his conviction. However, in addition to failing to make this argument explicitly, the petitioner has failed to come forward with the proper evidentiary support necessary to sustain such a claim. Both state courts made the factual determination that the trial testimony permitted the factual inference, beyond a reasonable doubt, that the petitioner's actions were motivated by an intent to defraud. See § 2254(e)(1) (West Supp. 1998) (determination of factual issues determined by state court presumed correct and petitioner bears burden of rebutting presumption of correctness by clear and convincing evidence). Therefore, only the petitioner's explicit legal argument warrants detailed analysis.

9

the fact that several credit union officers knew of, approved of, and in some cases even recommended that he proceed as he did militates against any inference that he had notice that his behavior was criminal.  He also urges that the Rhode Island false pretenses statute had never before been applied to reach his allegedly illegal conduct.

To the extent that the petitioner argues that he personally lacked actual notice that the conduct for which he was convicted was illegal, the argument is wholly without merit.  Cases cited by the petitioner himself acknowledge the principle that "ignorance of the law generally is no defense to a criminal charge." E.g., Ratzlaf v. United States, 510 U.S. 135, 149 (1994).  In this context, the Due Process Clause requires nothing more than that a criminal statute be sufficiently clear to provide fair notice to a reasonable person of what conduct is proscribed.  See United States v. Lanier, 520 U.S. 259, ___, 117 S. Ct. 1219, 1225 (1997).  The pertinent legal issue raised by the petitioner, therefore, is not whether he knew his conduct was illegal but whether a reasonable person could have known that his conduct was criminal prior to his conviction.  See id. at ___, 117 S. Ct. at 1225.  The court accordingly examines the Supreme Court of Rhode Island's implicit determination that the Rhode Island false pretenses statute is sufficiently clear to provide a reasonable person with adequate notice that the conduct in which

10

the petitioner engaged fell within the ambit of the statute.

The court first "asks whether the [United State] Supreme Court has prescribed a rule that governs the petitioner's claim." O'Brien, 1998 WL 257206, at *7. The Supreme Court of the United States has clearly embraced the principle that "'"no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."'" Lanier, 520 U.S. at ___, 117 S. Ct. at 1225 (quoting Bouie v. City of Columbia, 378 U.S. 347, 351 (1964) (itself quoting United States v. Harriss, 347 U.S. 612, 617 (1954))). It is equally clear, however, that this proclamation is an instance of a "general standard" that, while it covers the petitioner's claim, cannot be said to "require[] an outcome contrary to that reached by the relevant state court." O'Brien, 1998 WL 257206, at *8.

Nor do the Supreme Court cases cited by the petitioner provide a more specific principle that can fairly be said to compel a conclusion in the case at hand contrary to that reached by the state courts. See Lanier, 520 U.S. at ___, 117 S. Ct. at 1225; Ratzlaf, 510 U.S. at 148; Marks v. United States, 430 U.S. 188, 195 (1977); Bouie, 378 U.S. at 350-51. Lanier dealt with a state court judge convicted under the criminal civil rights statute for violating the constitutionally protected rights of five women by sexually assaulting them. See 520 U.S. at ___, 117 S. Ct. at 1222. The Sixth Circuit reversed his convictions,

11

holding that because the constitutional right that he was accused of violating "had not been previously identified by [the United States Supreme Court] in a case with fundamentally similar facts," he lacked adequate notice that his conduct would violate the statute. Id. at ___, 117 S. Ct. at 1222. The Supreme Court reversed, holding that the Sixth Circuit had invoked too narrow a view of what was required to serve as proper notice that a right was constitutionally protected. See id. at ___, ___, 117 S. Ct. at 1224, 1227. The relevance to this case is limited, however, because it dealt specifically with the definition of constitutionally protected rights in the context of the federal criminal civil rights statute. See id. at ___, 117 S. Ct. at 1224.

Ratzlaf involved the quantum of intent required to support a conviction for "willfully violating" provisions of the antistructuring statute, 31 U.S.C. §§ 5322(a), 5324(3). See 510 U.S. at 137-38, 146-47. The Supreme Court held that the statutory text of the provision at issue required that the defendant know that the structuring in which he was engaged was unlawful. See id. at 146-47. However, the Court expressly noted that this was a case in which Congress had provided by the terms of the offense a specific exception to the general rule that "ignorance of the law generally is no defense to a criminal charge." Id. at 149; see also Aversa v. United States, 99 F.3d 1200, 1205 n.4 (1st Cir. 1996) (noting that, after the Ratzlaf

12

opinion, Congress amended 31 U.S.C. § 5324 to remove willfulness as an element of the offense).

In Marks, the defendants were convicted of violating the federal obscenity statute not under the more favorable interpretation of what constituted obscenity in force at the time they committed the acts with which they were charged, but under a more expansive interpretation of the obscenity statute adopted after their arrest. See 430 U.S. at 194. The obscenity statute "always has used sweeping language to describe that which is forbidden," making judicial interpretation essential to provide fair warning of what conduct is prohibited. Id. at 195. The Supreme Court overturned their convictions because the retroactive application of the expanded definition of obscenity to their conduct failed to provide adequate notice that the conduct violated the statute. Id. at 195, 197. The Court also noted that its opinion was influenced by the fact that the statute at issue regulated expression and implicated First Amendment values. See id. at 196.

Bouie involved a state criminal trespass statute that was clear on its face and whose plain meaning did not reach the conduct for which the defendants were convicted. See 378 U.S. at 356. The state's supreme court on appeal, however, upheld the convictions by adopting "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language."

13

<u>Id.</u> at 352.  The Supreme Court reversed the convictions, holding that the retroactive application of such a reading of the statute failed to "give fair warning of the conduct that it makes a crime."  <u>Id.</u> at 350, 363.

None of these cases requires an outcome contrary to that implicitly reached by the Supreme Court of Rhode Island when it determined that the petitioner was not entitled to have his conviction invalidated.  See <u>O'Brien</u>, 1998 WL 257206, at *7.  The petitioner's case does not involve, as did <u>Lanier</u>, a statute that criminalized the deprivation of rights defined outside the statute itself.  Neither does it involve, as did <u>Ratzlaf</u>, a statute that has, as an element of the offense, a specific intent requirement so that a person accused of the crime must have knowledge that the conduct is illegal.  Unlike <u>Marks</u> and <u>Bouie</u>, the petitioner's case presents neither a changed judicial interpretation of a vague statute or a novel judicial interpretation of a clear statute to reach a result contrary to the statute's text.  Thus, neither the general principle espoused by these cases nor their specific holdings warrant habeas relief under the first part of the <u>O'Brien</u> inquiry.  See <u>id.</u>

Therefore, the court considers the second question:  whether the result reached by the Supreme Court of Rhode Island was an unreasonable application of existing Supreme Court precedent. See <u>O'Brien</u>, 1998 WL 257206, at *7.  Conviction under a criminal

14

statute violates the Due Process Clause if the statute is vague and the vagueness is not clarified by case law interpreting it, see Marks, 430 U.S. at 195, or if the statute is clear in the conduct that it defines as criminal but it is applied by judicial interpretation to a factual situation beyond the definition existing at the time of the challenged conduct, see Bouie, 378 U.S. at 350. As noted by the Supreme Court of Rhode Island, the crime of obtaining money by false pretenses has two elements: (1) the petitioner designedly obtained money from another by a false pretense or pretenses; and (2) the petitioner did so with the intent to cheat or defraud. See LaRoche, 683 A.2d at 995.

None of the terms of the false pretenses statute are sufficiently vague, either on their face or in light of Rhode Island case law, to implicate due process notice concerns. To be sure, the petitioner argues that his conduct differs from other Rhode Island false pretense cases because it does not involve a "lie," and, in a related contention, he claims that the statute has never been extended to reach behavior such as the "structuring" in which he was engaged. However, the term "false pretense" is reasonably clear, and a reasonable person would understand that the presentation to the credit unions of a straw borrower to enable the petitioner to obtain a loan for which he could not otherwise gain approval if he applied for it directly is a false pretense, if not a "lie." See State v. Aurgemma, 358

15

A.2d 46, 50 (R.I. 1976) (misrepresentation of existing fact is a "false pretense"). Further, the fact that the petitioner concocted a scheme creative enough so that no one before him had been punished for it under the false pretenses statute does not immunize him from criminal liability. The statutory text reached his acts and did so with enough specificity to provide adequate notice that the petitioner's conduct was proscribed irrespective of how he chose to characterize that conduct.

Thus, the petitioner's claim that he was doing nothing more than structuring transactions, which is not in itself illegal, is inapposite. The use of a false pretense to structure transactions meets the definition of the crime of obtaining money by false pretenses whether or not the false pretense can also be characterized as "structuring." Further, the fact that the lending limits represented only the internal policies of the credit unions and lacked the force of law is of no legal significance because of the evidence that the petitioner would not have qualified for the loans had he applied for them directly. The fact that certain bank officers knew that he was engaged in the endeavor, in one instance recommended this course of action, and in all three transactions helped him to execute his plan by presenting the sham to the relevant loan committees and recommending loan approval is also without legal significance. It is no defense to one's criminal activity to say that

16

others knew of, approved of, or even assisted in its commission.

For these reasons, the court concludes that the Supreme Court of Rhode Island's failure to overturn the petitioner's conviction on the grounds that he lacked adequate notice that the conduct he engaged in was criminal was neither "contrary to, [nor] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). The false pretenses statute provided adequate notice that the conduct engaged in by the petitioner was prohibited and the state courts' refusal to overturn his conviction on this basis was proper. Accordingly, the petition for a writ of habeas corpus must be denied.

## Conclusion

The petitioner's request for a writ of habeas corpus (document no. 1) is denied. The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

June 23, 1998
cc: Robert B. Mann, Esquire
    Lauren S. Zurier, Esquire
    Clerk, USDC-RI

17