**Lewis J. ATLEY, a/k/a Gary J. Semeniuk, Petitioner,**

v.

**John F. AULT, Warden, ASP, and The State of Iowa, Respondents.**

**Civ. No. 4–97–CV–90479.**

United States District Court, S.D. Iowa, Central Division.

Aug. 24, 1998.

Lewis J. Atley, pro se.

Thomas J. Miller, Attorney General of Iowa, Robert P. Ewald, Asst. Atty. General, Des Moines, IA, for Respondents.

## MEMORANDUM OPINION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

### MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Lewis J. Atley, acting without counsel, petitions this court to issue a writ of habeas corpus. Atley claims he was denied his Sixth Amendment right to counsel in a state criminal trial. This court agrees and grants Atley's petition, subject to a temporary stay.

### I. BACKGROUND

Atley was convicted by a jury on June 8, 1995, for various drug-related crimes. The convictions were upheld by the Iowa Supreme Court in a panel opinion decided January 22, 1997. Thereafter, acting on his own behalf, Atley petitioned for and was granted an en banc rehearing. The en banc court again upheld the convictions, this time over three dissenting justices. *State v. Atley*, 564 N.W.2d 817 (Iowa), *cert. denied,* — U.S. ——, 118 S.Ct. 577, 139 L.Ed.2d 416 (1997).

Atley then filed his petition for writ of habeas corpus with this court.[1] The parties have filed briefs supporting their positions, and the matter is now fully submitted.[2]

The following relevant facts, as found by the Iowa Supreme Court, are not in dispute and are incorporated into this opinion:

On October 28, 1994, the prosecutor filed a six count indictment against Atley. Attorney J.E. Tobey, III was appointed to represent Atley.

On November 16, 1994, Tobey filed a motion to withdraw, stating that he was uncomfortable representing Atley because Atley insisted on acting as co-counsel. The court granted the motion and appointed attorney Carroll J. Walker to represent Atley.

On January 27, 1995, Atley asked that Walker be replaced. The district court granted the request, noting "it appears all communication between defendant and counsel had broken down." The court then appointed attorney Robert Weinberg to represent Atley. On the same day, Atley filed a waiver of his right to a speedy trial.

On February 24, 1995, the court granted a motion by Atley to continue the suppression hearing set for that date. The court also ordered the trial continued until May 1, 1995. Atley filed a second speedy trial waiver.

On March 27, 1995, the court granted Atley's request to continue the scheduled hearing on pending motions.

On April 21, 1995, a pretrial conference was held. The trial was scheduled for June 5, 1995.

On June 1, 1995, attorney Robert Weinberg learned he had been hired to replace Hugh Pries at the Scott County Attorney's office on or about June 15. Pries handled a large number of the drug cases for the county attorney's office and had close relationships with the MEG officers, who were to be the main witnesses in Atley's case. Weinberg disclosed these facts to Atley. At that same time, a plea bargain was in place and was being considered by Atley. Weinberg believed that with a full disclosure of the situation to Atley, the case would be resolved if he accepted the plea

---

1. Atley's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, was originally dismissed for failure to exhaust state court remedies. The court granted Atley's Motion for Expedited Reconsideration of Initial Review Order of Section 2254 Petition after Atley clearly understood that raising his Sixth Amendment claim

regarding a conflict of interest of his trial counsel at this time would result in the forfeiture of unexhausted issues. Atley requested that counsel not be appointed in this case.

2. Apparently, Atley has recently been released on parole.

bargain. If not, Weinberg felt that he could not adequately and effectively represent Atley, given the potentiality of a conflict of interests.

On June 2, 1995, Weinberg filed a motion to withdraw as counsel of record citing ethical and disciplinary rules, and constitutional concerns. Atley also filed a motion for removal of counsel and phoned a threat to Weinberg that he would ask the Iowa Supreme Court to sanction him.

On June 5, 1995, the court heard arguments on the motion to withdraw as counsel. Weinberg argued his concerns about conflicts of interests. He also stated additional reasons for his motion, stating the following:

Mr. Atley also has filed some other motions recently, where he raises questions about things that I've done or failed to do. He has waived speedy trial. I think, as is his right, he would like to rescind the waiver, which I advised him would give him another ninety days, but at this point he has waived a speedy trial. I think he would be entitled to reasonable time to prepare for trial with new counsel. I took depositions in this case. We had basic pretrial motions that are important to how the case will go forward, such as a motion to suppress and a basic motion to dismiss, based on constitutional objections to the institution of the prosecution.

I feel that there has been adequate preparation taken so that an additional—a new attorney would just clean up those items that Mr. Atley had wished to pursue prior to a trial, but I think under all the circumstances—just to be quite candid with the court, I just feel that I'm put in a very difficult position, in terms of what the canons of ethics require.

Mr. Atley, I think, as shown from the record, is a fairly difficult person to deal with. I've had rapport with him; however, on my answering machine this morning was a—you know threat to ask the Supreme Court to take sanctions against me, which after I talked to him last night—I mean—I had no inkling about, but—you know, I got different signals from him. I just think that there's such a breach in the attorney/client relationship that I could not be effective, and I think the outcome of

this case is likely to be such that the fact of my having pursued a trial under these circumstances would raise serious questions about whether or not any future conviction would stand, that I have—I have that concern also.

The State responded as follows:

THE COURT: Does the State have anything it wishes to add?

MR. OTTESEN: Yes, Your Honor. I have reviewed Canon 5, which states a lawyer should exercise independent professional judgment on behalf of a client, have also reviewed the ethical considerations in the disciplinary rules under that canon, and I concur with Mr. Weinberg in the conclusions that he has drawn from them.

The State is in a very difficult position in this case, in raising—in making a specific statement or a specific claim, since Mr. Weinberg is going to be, in the near future, working with us. Most of the cases and opinions that have dealt with changes of employment by lawyers have opted in favor of the client being given the rights, and not deprived of them, and I think that clearly, in this case, forcing this matter to trial today would be going against the general grain of those opinions.

The court then stated its ruling and reasons for it:

THE COURT: The Court has heard the arguments of counsel today and has considered this question since last week, also having reviewed the canons and the ethical considerations. The Court finds that this motion to withdraw as counsel should be overruled and denied, and is doing so.

In this case, the Court can find that, while Mr. Weinberg is going to work at the County Attorney's Office on June 15 and did learn that would be the case on June 1, he has represented this client zealously throughout the pendency of these proceedings and has done a number of things on behalf of this client to prepare for trial today. The Court is not advised of any information that Mr. Weinberg has worked with the MEG officers or not worked with the MEG officers, and also notes that, in

this community, our court-appointed attorneys, our defense bar, are people who, with some frequency, do become a county attorney for some period of time, and I am aware of no rule, nor any policy, that says when one goes from the defense bar to the prosecution that there must be a period of so many days, weeks or months, in which one cannot represent defense clients. And the same is true on the other end, we often have county attorneys who leave the County Attorney's Office and do criminal defense, and, again, I am not aware of any policy or rule or case which states that there must be so many days, weeks or months in which those people have to make transitions from being a prosecutor to a defense counsel.

In this district, I can also point out we also have the scenario where we have part-time magistrates. Several of our part-time magistrates, who serve one day a week in a judicial capacity, also serve on our criminal court appointment list, and are able to change their hats, and we have not raised that as a difficulty.

In this case, Mr. Weinberg has not changed his hat yet, he will on June 15, and my personal acquaintance with Mr. Weinberg and his abilities as an attorney is that he will be one hundred percent professional and zealous on behalf of his client in this matter, and when he goes to the County Attorney's Office on June 15 he will be one hundred percent zealous in that role also.

I can appreciate the fact that the spot which Mr. Weinberg is taking will be one in which he will work frequently with the MEG officers, and—I think that the MEG officers, in addition to the prosecutors and the defense bar, all get along well and understand each other's roles, and will be not inclined to testify any differently at this trial than they would be otherwise, nor will they treat Mr. Weinberg any differently after June 15, when he changes hats.

I think Mr. Weinberg has demonstrated his competency and his experience as an attorney, and, in fact, I'm sure that's why the County Attorney's Office has offered him a job, to start June 15, is that he is a competent and experienced attorney, and that he will zealously represent the State, just as he presently zealously represents the defendant.

I know the concerns that are raised that this client has stated in his own motions, that his—he feels that he cannot be properly represented by an attorney who's going to the County Attorney's Office, and that he desires to have a different attorney. However, I don't give that a huge amount of weight, because Mr. Atley is on his third attorney at this time, and there have been other issues which have caused Mr. Atley to request attorneys, and, frankly, this case has been pending since November, and it appears to me that—perhaps this is an unknown to me, what the reason would be for this, but it appears to be some sort of a way to delay the proceedings, and the Court is not going to buy into that.

The Court will merely state that Mr. Weinberg will be expected to provide Mr. Atley with his usual high quality of representation and be zealous in his representation.

The motions that are presented here today—I'm sure Mr. Weinberg is ready to proceed, and I'm also sure that, with regard to the case that's set to begin today, Mr. Weinberg will do an excellent job in representing Mr. Atley's interests at the trial.

The motion for continuance, based on the motions to disqualify Weinberg as counsel, was subsequently denied.

*Atley,* 564 N.W.2d at 822–24.

## II. DISCUSSION

### A. *The Great Writ of Habeas Corpus*

Before discussing the merits of the various legal arguments, the court should define the nature of the writ of habeas corpus and its relationship to state court decisions. The importance of the "Great Writ" of habeas corpus is almost impossible to overstate. As Justice Brennan said in the landmark case of *Fay v. Noia,* 372 U.S. 391, 401–02, 83 S.Ct. 822, 828–29, 9 L.Ed.2d 837 (1963) (footnotes omitted), *overruled on other grounds by, Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991):

Although in form the Great Writ is simply a mode of procedure, its history is inextricably intertwined with the growth of fundamental rights of personal liberty. For its function has been to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints. Its root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release.

On a more technical level, federal habeas corpus has always been considered an original proceeding to test the legality of a prisoner's custody simpliciter. *Fay*, 372 U.S. at 423–24, 83 S.Ct. at 840–41. The Anti–Terrorism and Effective Death Penalty Act of 1996 [AEDPA], however, prescribes a certain method for the review of state court adjudications. The relevant portions of the AEDPA are as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1998).

A wide variety of interpretations have been given to these provisions. *See, e.g.,* Evan Tsen Lee, *Section 2254(d) of the New Habeas Statute: An (Opinionated) User's Manual,* 51 Vand.L.Rev. 103 (1998); Larry W. Yackle, *A Primer on the New Habeas Corpus Statute,* 44 Buff.L.Rev. 381 (1996); Note, *Rewriting the Great Writ: Standards of Review for Habeas Corpus Under the New 28 U.S.C. § 2254(d),* 110 Harv.L.Rev. 1868 (1997); Note, *The Avoidance of Constitutional Questions and the Preservation of Judicial Review: Federal Circuit Court Treat-* *ment of the New Habeas Provisions,* 111 Harv.L.Rev. 1578 (1998). In this court's estimation, the most trenchant interpretation is Circuit Judge Selya's recent opinion in *O'Brien v. Dubois,* 145 F.3d 16 (1st Cir.1998).

The *O'Brien* opinion establishes a two-step analysis:

First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

*O'Brien,* 145 F.3d at 24. Under the first step, it is not enough for the habeas petitioner to argue that the Supreme Court has articulated a general standard that governs the claim. *Id.* The petitioner must additionally show that Supreme Court precedent mandates an outcome "contrary to" that reached by the state court. *Id.* The second step is further elucidated:

If no Supreme Court precedent is dispositive of a petitioner's claim, then, a fortiori, there is no specific rule to which the state court's decision can be "contrary." In such circumstances, a federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence. This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable.

*Id.* at 25.

Holding that a state court's decision is unreasonable does not, of course, mean or require that the state court judge or judges are unreasonable themselves. *O'Brien,* 145 F.3d at 26 n. 7. Reasonable people sometimes do unreasonable things. Nevertheless, it is not enough merely to dis-

agree. "Rather," as Judge Selya aptly points out, "for the writ to issue, the state court proceeding must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Id.* at 25. A good reference point for making such a determination is the extent to which other inferior federal courts have decided factually similar cases. *Id.* Indeed, such decisions from our Eighth Circuit Court of Appeals must remain binding upon this court. *See* Lee, *supra*, at 131–36 (describing the importance of stare decisis in the AEDPA context).

Given that the Iowa Supreme Court cites to many of the generally relevant United States Supreme Court precedents and does not explicitly disavow these precedents, this court will go directly to the second step of the *O'Brien* inquiry. Taking the Iowa Supreme Court's opinion as the discussion's cynosure, this court decides whether *Atley* was an "unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). This step requires the court to set out the clearly established federal law regarding the Sixth Amendment right to counsel.

### B.   The Sixth Amendment Right to Counsel

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The United States Supreme Court has continually emphasized "that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided to him." *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). "[L]awyers in criminal courts are necessities, not luxuries." *Gideon,* 372 U.S. at 344, 83 S.Ct. at 796.

▄▄▄ Whether counsel is appointed or selected, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant...." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). An "effective" advocate is a "zealous" and "active" advocate. *See Powell v. Alabama,* 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932).

> The paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question.

*Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988) (internal quotations omitted).

Along these lines, the Eighth Circuit Court of Appeals recently stated:

> Courts have long recognized that the Sixth Amendment right to counsel contains a correlative right to representation that is unimpaired by conflicts of interest or divided loyalties. *See, e.g., Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *Von Moltke v. Gillies,* 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948) (plurality); *Hart,* 557 F.2d at 163. Counsel must be willing "to advocate fearlessly and effectively" on behalf of the client. *United States v. Hurt,* 543 F.2d 162, 167–68 (D.C.Cir.1976). Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties. *Zuck v. Alabama,* 588 F.2d 436, 440 (5th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), and can include situations in which the caliber of an attorney's services "may be substantially diluted." *Hurt,* 543 F.2d at 166.

*Smith v. Lockhart,* 923 F.2d 1314,. 1320 (8th Cir.1991).

▄▄▄ When a defendant raises a seemingly substantial complaint before trial regarding the defense attorney's conflict of interest or divided loyalty, the Supreme Court has been absolutely clear that the court must make a thorough inquiry into the factual basis for the defendant's complaint. *Holloway v. Arkansas,* 435 U.S. 475, 488–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426 (1978); *see Smith,* 923 F.2d at 1320. That inquiry

should be on the record and must be of the kind to ease the defendant's dissatisfaction, distrust, or concern. *Smith*, 923 F.2d at 1320. If the trial court fails to make a sufficient inquiry, prejudice is presumed and "reversal is automatic." *Holloway*, 435 U.S. at 488–89, 98 S.Ct. at 1181.

■ It is also clear that if, upon a thorough inquiry by the court, good cause is shown for substitution of counsel and the trial court fails to make the substitution, prejudice is again presumed and reversal again is automatic. *Id.; Smith*, 923 F.2d at 1321. As the *Holloway* Court reiterated: "The right to have the assistance of counsel is too fundamental and absolute to indulge in nice calculations as to the amount of prejudice arising from its denial." *Holloway*, 435 U.S. at 488, 98 S.Ct. at 1181 (quoting *Glasser v. United States*, 315 U.S. 60, 75–76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942)).

### C. State v. Atley

■ This court is compelled to find the majority opinion of the Iowa Supreme Court an unreasonable application of clearly established federal law, as established by the Supreme Court of the United States. The Iowa Supreme Court failed to require the constitutionally mandated inquiry by the trial court and also failed to require the substitution of counsel free from the constitutionally prohibited constraints of a conflict of interest.

### 1. The Duty to Inquire

The state courts in this case made absolutely no inquiry into the conflict of interest issues despite the timely complaints of petitioner Atley, his attorney, and the state prosecutor. In so doing, the Iowa Supreme Court disregarded the explicit command of the United States Supreme Court in *Holloway*. *Id.; see also Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981) (holding that mere possibility of a conflict of interest triggers duty to inquire).

The Iowa Supreme Court acknowledged that its trial court had a constitutional duty to inquire in this case. *Atley*, 564 N.W.2d at 829 ("The actual or serious potential for conflict that might occur during the trial necessitated an inquiry by the court to assess its gravity."). Nevertheless, the court held it was "unlikely that *further questioning* of any of these people would have shed more light on the matter from which the court could base its decision." *Id.* (emphasis added). The court's own portrayal of the record, however, clearly demonstrates that the trial court failed to ask a single substantive question of anyone. There simply was no "questioning" upon which to build "further questioning." For this court to accept as "adequate inquiry" the failure to make any inquiry whatsoever, it would have to effectively and obviously eviscerate the spirit and letter of *Holloway*.

In lieu of the probing and specific questions necessary to any real inquiry, the Iowa Supreme Court chose to accept the untesting general observations of the trial court. For example, one issue that arose during attorney Weinberg's representation of Atley was Atley's contention that the officers in charge of his case intentionally and in bad faith destroyed key evidence that would have weighed in Atley's favor. These were the very officers Weinberg would be working closely with in a matter of days. The trial judge, rather than asking such questions as: "Have you had any explicit or implied threats from these officers about your future working relationship if you were to question their integrity?"; "Would you feel constrained in any way from cross-examining future coworkers?"; "Have you had to cross-examine any of these officers since you applied for or accepted the job at the County Attorney's Office?" Instead of such questions, the trial court merely noted his own general impression that everyone in the prosecutor's office seemed to get along well with members of the defense bar.

Again for example, the trial court judge was satisfied that Weinberg *would be* zealous at trial because he *had been* zealous on behalf of Atley pre-trial. To say nothing of the fact that the trial judge may not have much true insight into when an attorney is zealous or not at any time, especially when he fails to ask the client if he is satisfied or has any specific complaints, it seems that it did not cross the judge's mind that a conflict may have arisen—avenues may not have been

pursued or pursued vigorously—after the time of application rather than hire. Given this somewhat obvious concern, what ground for comparison is Weinberg's prior representation of Atley? The trial judge treats the conflict of interest as if it appeared out of thin air on June 1, 1995, when Weinberg was hired by the County Attorney, and does not even ask when he applied or what affect the application may have had.

A final example is the bar complaint, or threat of bar complaint, Weinberg put forth as a basis for withdrawal. The trial court did not inquire what the complaint was about, whether it was potentially meritorious, or whether it had in fact been filed. All relevant questions, none asked.

Some of these questions may have led to more questions or more concerns. Some of the answers may have even assuaged Atley's anxiety. Such results are surely what the *Holloway* court intended by requiring inquiry. Instead, this court, as well as any appellate court, is left with the cold record, unenlivened with any inquiry or concern. *Holloway* dictates that "reversal is automatic" in such a case. This court must, therefore, issue a writ of habeas corpus.

### 2. Duty to Substitute Counsel

United States Supreme Court precedent requires finding Weinberg's employment with the very office prosecuting his client to be an actual conflict of interest. Atley, his counsel, and the state prosecutor all raised this issue in a timely fashion and prior to the commencement of trial. The Iowa Supreme Court was, according to *Holloway*, constitutionally required to substitute new counsel. *Holloway*, 435 U.S. at 489, 98 S.Ct. at 1181.

The Iowa Supreme Court held:

There is no evidence in this record that Weinberg's future employment in the county attorney's office created an actual conflict of interest. Weinberg only learned on June 1, 1995 of this employment that would not begin until June 15, 1995. Weinberg had been appointed to represent Atley since January 27, 1995 and had prepared the case for trial from then until June 1, 1995. Weinberg diligently prepared Atley's case, without any actual conflict, up to the day scheduled for trial. Moreover, Weinberg immediately informed

Atley on June 1 of his future employment, so that Atley's reliance on counsel was never compromised.

*Atley,* 564 N.W.2d at 828–29. First of all, this statement mimics the trial courts uninvestigated assumption that Weinberg's conflict of interest between defending Atley and courting a job for the prosecution arose spontaneously on June 1, 1995. Almost certainly Weinberg applied for the job before he accepted it. To say that Atley's "reliance on counsel" was never "compromised" or that Weinberg never had any conflict whatsoever before June 1 is, therefore, most likely incorrect.

The Eighth Circuit, reviewing such cases as *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), and *Zuck v. Alabama,* 588 F.2d 436 (5th Cir.1979), has explicitly recognized that an actual conflict exists when "an attorney is placed in a situation conducive to divided loyalties." *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir.1991). Clearly, having to compete against one's future employer's interest in a conviction and having to choose between advocating for one's client and offending the sensibilities of future co-workers, is "conducive" to divided loyalty issues and the substantial dilution of an attorney's services. In fact, *Zuck* and *Von Moltke* dealt with very similar issues themselves and both cases resulted in reversal of the trial court. *Von Moltke,* 332 U.S. at 725–27, 68 S.Ct. at 324–25; *Zuck,* 588 F.2d at 440–41.

In *Zuck,* the court held that a criminal defendant's right to counsel had been violated by an actual conflict of interest when the defendant's attorneys' law firm·represented the State prosecutor, in an unrelated civil matter, during defendant's murder trial. *Zuck,* 588 F.2d at 439. The court stated:

The dual representation here created an actual conflict of interest. The prosecutor and the defense attorneys here were adversaries for the purpose of this trial. It is sufficient to establish a constitutional violation that the defense attorneys owed a duty to Zuck to endeavor to refute the prosecutor's arguments and to impeach his witnesses. This being so, the same concern which underlays *Castillo [v. Estelle,* 504 F.2d 1243 (5th Cir.1974) (Wisdom, J.) ]

is also present here: the defense attorneys were subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense of Zuck and dispense with the services of their firm. Indeed, the potential prejudice arising from the conflict here is even greater than that found in *Castillo*, in which the danger of ineffective representation was limited to the cross-examination of a single prosecution witness. Here, the conflict could conceivably have infected the entire trial.

*Id.* For all practical purposes, *Zuck* is indistinguishable from *Atley*. If anything, the concern would be greater for Atley: Weinberg would not only be risking the good will of his future employer, but also the good will of the officers integral to his future success.

*Von Moltke* involved an alleged right to counsel violation in which a criminal defendant was given legal advice at various stages by FBI officers. Justice Black's plurality opinion stated:

> The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client. *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680. Before pleading guilty this petitioner undoubtedly received advice and counsel about the indictment against her, the legal questions involved in a trial under it, and many other matters concerning her case. This counsel came solely from government representatives, some of whom were lawyers. The record shows that these representatives were uniformly courteous to her, although there is no indication that they ever deviated in the slightest from the course dictated by their loyalty to the Government as its agents. In the course of her association with these agents, she appears to have developed a great confidence in them. Some of their evidence indicates a like confidence in her.

> The Constitution does not contemplate that prisoners shall be dependent upon government agents for legal counsel and aid, however conscientious and able those agents may be. Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision.

*Von Moltke*, 332 U.S. at 725–26, 68 S.Ct. at 324 (footnotes omitted). To hold that *Von Moltke* stands only for the proposition that those currently on the government roles cannot fulfill the constitutional requirement of counsel for the defense, would exalt form over substance. The reasons behind disallowing prosecution or investigative officers from fulfilling the defense counsel function are certainly based on the requirements of zealous advocacy and adversarialness essential to our system of justice. *See Penson*, 488 U.S. at 84, 109 S.Ct. at 352. Those requirements cannot be met fully and fairly when one is involved and has interests on both sides of a case. It would defy any honest assessment of how the mind can work prejudice on our actions, "however conscientious and able" the actor, to say that a defense attorney has an actual conflict his first day working for the prosecution and no conflict the day before. Certainly this is what the *Smith* opinion meant in defining conflict as "a situation conducive to divided loyalties," including "situations in which the caliber of an attorney's services may be substantially diluted." *Smith*, 923 F.2d at 1321 (internal quotations omitted).

The *Atley* majority makes much of the Seventh Circuit decision *United States v. Horton*, 845 F.2d 1414 (7th Cir.1988), in which it was held that the Sixth Amendment right to counsel was not violated when the defense attorney had applied for a job as U.S. Attorney. *See Atley*, 564 N.W.2d at 826–29. The *Atley* court, however, ignored several fundamental distinctions between Atley's case and the *Horton* case. First, *Horton* stands only for the proposition that a defense attorney's applying for a job with the prosecution is not a per se violation of the Sixth Amendment right to counsel for that attorney's client. *Horton*, 845 F.2d at 1419–20. The *Horton* court admits that in some factual scenarios there may be a violation. In fact, the *Horton* court cites a prior Seventh Circuit case for the proposition that, if the defense attorney admits he feels a conflict in such a situation, a Sixth Amendment violation will be found. *Id.* at 1420 (discussing *United States v. Ellison*, 798 F.2d 1102 (7th Cir.1986)). In *Horton*, the defense counsel expressly disavowed any sense of

conflict, whereas Atley's defense counsel himself moved to withdraw on exactly such grounds.

Such deference to the expressed feelings of concern by the defense attorney as in *Horton*, it must be noted, are exactly in line with United States Supreme Court precedent from *Holloway* :

> [S]ince the decision in *Glasser* [v. U.S., 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ], most courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be granted. In so holding, the courts have acknowledged and given effect to several interrelated considerations. An "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." Second, defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem. Finally, attorneys are officers of the court, and "when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." We find these considerations persuasive.

*Holloway*, 435 U.S. at 485, 98 S.Ct. at 1179 (citations omitted). The *Atley* majority ignores this important command from our highest court and its echo in *Horton*.

Two other important distinctions between *Atley* and *Horton* should be pointed out. Defendant Horton was never forced to trial with potentially conflicted counsel, while Atley was. In trial, as opposed to the taking of a guilty plea in *Horton*, there is of course a jury. A jury is often likely to pick up even subtle notes of apprehension in the supposedly zealous representative and advocate for the defendant. In this way, even the most conscientious advocate may unintentionally and spontaneously belie inner conflict and thereby substantially erode his effectiveness.

As all parties admit, *Atley* is to be decided under the *Holloway* framework. *Horton*, on the other hand, was decided under the more demanding framework of *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *Cuyler*, which involves cases where the defendant does not object to counsel until after trial, contemplates the value of keeping intact a criminal conviction and, therefore, requires a showing that the actual conflict of interest had some adverse effect on defense counsel's performance. *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718. No such interest arises to balance concerns of actual conflict in *Holloway*. *Holloway*'s prophylactic rule protects the very interest of keeping verdicts intact by covering more types of situations than *Cuyler*. The *Horton* court's result may have been different under the prophylactic rule of *Holloway*.

The only United States Supreme Court case discussed extensively by the *Atley* majority was *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). *Wheat* stands for the proposition that while the Sixth Amendment requires a presumption in favor of the criminal defendant's counsel of choice, that presumption may be outweighed by such interests as the guarantee of an effective advocate for the defense, ensuring trials are conducted within ethical standards of the profession, and the appearance of fairness to all who observe. *Wheat*, 486 U.S. at 159–64, 108 S.Ct. at 1697–99. It is undeniable that all of these interests, including the presumption in favor of counsel of defendant's choice, line up in favor of requiring attorney Weinberg to withdraw from Atley's case.

In light of these Supreme Court precedents and the various Courts of Appeals' decisions on this matter, this court is compelled to find the decision of the Iowa Supreme Court in *State v. Atley*, 564 N.W.2d 817 (Iowa 1997), an unreasonable application of federal law, as determined by the Supreme Court of the United States.[3]

---

3. The State's brief reiterates most of the arguments found in the *Atley* majority opinion. It does, however, note the British practice of a joint-prosecution-and-defense bar as evidence "there is nothing inherent in human nature or in the practice of law which would prevent a lawyer from zealously representing an accused person one day, then zealously representing the government the next." (Resp. Br. at 17.) Although wary of playing amateur comparative legal scholar, the court notes that the custom and practice of British law admits of many complexities and

The court finds that the employment issue alone constitutes sufficient ground to grant Atley's petition for the Iowa Supreme Court's failure to require new counsel. The court finds also, on the basis of *Smith v. Lockhart,* 923 F.2d 1314 (8th Cir.1991) and the cases cited therein, that Atley's actual or threatened bar complaint provides independent reason to require new counsel under the authority of the United State Constitution.

The following is **HEREBY ORDERED**:

Accordingly, the petition for writ of habeas corpus is **GRANTED**. The execution of the writ of habeas corpus, however, is **STAYED** for 90 days from the date of this order to permit the State of Iowa to make a decision whether to prosecute petitioner again, and if so, time to provide Atley with a new trial. If petitioner is not provided with a new trial within the time specified, the writ shall issue, and the respondent shall release petitioner from any incarceration or other restraint.

nuances and that many of the practices of their bar would undoubtedly strike our population as both odd and troubling in a constitutional sense. By way of comment on why the State's argument based on such comparisons fails to persuade this court, the following quotes from recent articles are supplied:

> It can be argued that the British deference to the court and the judicial system goes too far. In particular, defendants in the criminal justice system may sometimes wonder whether they are truly represented. In a British court, the defendant sits in a "dock" at the back of the courtroom, several rows behind his barrister. The defendant is frequently unable to communicate directly with him or her during the proceedings. A passive participant in the trial, he watches from a distance as the barristers and the judge resolve issues affecting his fate. The formalism of counsel's required bows to the judge, as well as the exaggerated politeness of opposing counsel to the court and to each other may lead the defendant to question whether his barrister is his champion or simply a cog in a rather elaborate machine designed to go through a ritual to convict him.

Janeen Kerper & Gary L. Stuart, *Rambo Bites the Dust: Current Trends in Deposition Tactics,* 22 J. Legal Prof. 103, 107–08 (1998);

> In contrast, says Graham [author of 1984 book on the British system], the English barrister displays a far more detached attitude than his American counterpart. Since the barrister is a trial lawyer only, an English solicitor prepares the case. Because the barrister for both prosecution and defense reads the briefs and prepares for trial the night before it is to occur, he does not become as personally involved as an American attorney. This detachment is also physically evident in the courtroom. The English barrister does not stand by his client; rather, the barristers for defense and prosecution stand together, identically clothed in wigs and robes. Graham notes that distinctive elements of the British legal profession, such as the fact that barristers represent both prosecution and defense in different cases, may account for the less aggressive attitude of the British barrister.

Book Review, *Tightening the Reins of Justice in America: A Comparative Analysis of the Criminal Jury Trial in England and the United States. By Michael H. Graham,* 82 Mich.L.Rev. 1131, 1133 (1984). With regard to the inherent qualities of human nature, the court would refer to the body of this opinion and its discussion of relevant precedent.