Theodore TRIGONES, Petitioner,

v.

Timothy HALL, Superintendent, Massachusetts Correctional Institute—Norfolk, Respondent.

No. CV 97–10545–JLT.

United States District Court,
D. Massachusetts.

Sept. 27, 2000.

Judith F. Bowman, Bowman, Moos & Hilton, Cambridge, MA, for plaintiff.

Theodore Trigones, Gardner, MA, pro se.

William J. Meade, Assistant Attorney General, Boston, MA, for Paul Dipaolo, defendant.

## MEMORANDUM

TAURO, District Judge.

Petitioner, Theodore Trigones ("Petitioner"), brings this habeas corpus petition under 28 U.S.C. § 2254. As grounds for seeking the Great Writ, Petitioner alleges that he was denied the effective assistance of counsel (in violation of the Sixth and Fourteenth Amendments), as well as his Sixth Amendment confrontation rights. In addition, Petitioner challenges on Due Process and Equal Protection grounds the Massachusetts "gatekeeper" statute that limits his ability to appeal the denial of his motion for a new trial to the full Supreme Judicial Court ("SJC").[1] For the reasons discussed below, the petition is DENIED.

## I. BACKGROUND

On Petitioner's direct appeal of his conviction, the SJC determined that the jury could have found the following facts:

The victim, a thirteen-year old baby-sitter, died of multiple stab wounds on July 1, 1983, in the living room of a residence in Lowell where she had been taking care of two young children. Her body was found that day lying face down

---

1. Mass.Gen.Laws ch. 278, § 33E provides as follows:

If any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court.

on the floor between a couch and a coffee table. The father, Leo Trzcinski, Jr., did not then live in the residence where the victim was killed. He had separated from his wife a few weeks earlier and was living with his sister and the defendant elsewhere in Lowell.

The jury heard evidence of the separate wanderings of the defendant and Trzcinski during the evening before the killing. The defendant spent much of the night looking for Trzcinski. Sometime after 1:30 A.M. on July 1, the defendant arrived at his mother's house in Lowell. He was wearing no shirt. His pants and sandals were stained. The palm of one hand was cut and bleeding. About 5:30 A.M., the defendant, his brother, and their stepfather, Roland Weed, left the house to hide the defendant's motor vehicle. During that trip, while his brother was inside a coffee shop, the defendant made incriminating statements to Weed. Later that morning, Weed drove the defendant to a Lowell hospital for treatment of an apparent drug overdose.

About 4:30 A.M. on July 1, Trzcinski entered the residence where his wife and children lived. He had tried unsuccessfully to reach the house by telephone and had driven there looking for his wife. The baby sitter appeared to be asleep on the floor in front of the couch. Trzcinski founds his two children asleep upstairs in one bed. His wife was not home. He made coffee, used the telephone in an effort to find his wife, and then sat in the living room to await her return. As dawn advanced and the room became lighter, Trzcinski noticed blood on the victim's hand and realized that the couch was stained with blood. He concluded that the baby-sitter was not asleep and summoned assistance.

The defendant accused Trzcinski of stabbing the victim. He testified that he went to the Trzcinski residence that night and saw Trzcinski sitting near the dead girl. As he tried to take a knife away from Trzcinski, the defendant was cut on the palm. There was evidence that Trzcinski was jealous of his wife, that he took their bed away when he left the family residence, and that his wife, therefore, slept on the living room couch. The defendant sought to establish the inference that a jealous Trzcinski had discovered the baby sitter on the couch and, mistaking her for his wife, stabbed her repeatedly.

*Commonwealth v. Trigones*, 397 Mass. 633, 492 N.E.2d 1146, 1147–48 (1986) (*"Trigones I"*).

The jury heard testimony that, in the morning after the killing the Petitioner made incriminating statements to his stepfather, Roland Weed. That evidence came not directly from Weed but through the reading of a transcript of his testimony at a pre-trial hearing. During the trial, Weed successfully asserted his Fifth Amendment privilege against self-incrimination, *see Commonwealth v. Weed,* 17 Mass.App.Ct. 463, 459 N.E.2d 144 (1984), and the judge declared him unavailable as a witness. In portions of his transcribed testimony admitted in evidence, Weed stated that, in the early daylight hours of July 1, 1983, the Petitioner had told him that he had done "something terrible," that he had "killed someone," that there was "a lot of hate" in him, and he guessed that "if it wasn't her, it would have been somebody else." *Trigones I,* 492 N.E.2d at 1148.

## II. PROCEDURAL HISTORY

On July 19, 1983, a Middlesex County grand jury returned an indictment charging Petitioner with murder in the first degree (in violation of G.L. c. 265 § 1). A Middlesex County Superior Court jury returned a guilty verdict against Petitioner on February 13, 1984. The presiding judge (Tuttle, J.) sentenced Petitioner to life imprisonment without the possibility of parole.

As provided in Mass.Gen.Laws ch. 278 § 33E ("section 33E"), Petitioner appealed his capital conviction directly to the SJC, alleging, *inter alia,* that the trial judge

curtailed his confrontation rights by admitting the transcribed testimony of Roland Weed despite having limited Petitioner's cross-examination of Weed at the pre-trial hearing. The SJC rejected Petitioner's argument in affirming the conviction, holding rather that the judge "asked the defendant to explain the relevance of [his line of questioning]," an invitation defense counsel declined before abandoning the point. *Trigones I*, 492 N.E.2d at 1150. The SJC also held that, despite counsel's failure to press this point with the trial judge, Weed's testimony bore "adequate indicia of reliability" under *Ohio v. Roberts*, 448 U.S. 56, 61–62, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), because the "restriction of Weed's cross-examination was of no demonstrated practical significance." *Trigones I*, 492 N.E.2d at 1150.

The SJC also engaged in the "plenary" review Mass.Gen.Laws Ch. 278 § 33E provides for, examining the entire trial record to determine whether the evidence was "against the law or the weight of the evidence." *Id.* The SJC found that Petitioner was not entitled to section 33E relief. *See Trigones I*, 492 N.E.2d at 1151.

On July 12, 1991, several years after the SJC affirmed Petitioner's conviction, Petitioner brought a motion for new trial pursuant to Massachusetts Rule of Criminal Procedure 30(b). For the first time, Petitioner alleged that he had been denied the effective assistance of counsel, both prior to and during trial, in violation of the Sixth and Fourteenth Amendments. On September 11, 1991, the trial court denied that motion without a hearing or any findings of fact.

Under section 33E, a capital defendant may only appeal such a denial of a motion for new trial to a single justice of the SJC. That single justice, sitting as a "gatekeeper," reviews the appeal to determine whether it presents "a new and substantial question which ought to be determined by the full court." The single justice's decision is not subject to review. *See Commonwealth v. Ambers*, 397 Mass. 705, 493 N.E.2d 837, 841 (1986); *Leaster v. Commonwealth*, 385 Mass. 547, 432 N.E.2d 708, 709 (1982).

Petitioner appealed the denial of his motion for a new trial to the single justice, asserting that his ineffective assistance claims constituted a new and substantial question warranting consideration by the full court. *See* Mem. of Law in Support of Mot. for Leave to Appeal, attached at Tab 2 to Resp't's Supplemental Answer, Volume I ("SA I"). The Commonwealth opposed Petitioner's motion, arguing that the issues presented by the motion were not "new" within the meaning of section 33E because Petitioner could have raised them in his direct appeal. *See* Resp't's First Opp'n to Leave to Appeal, attached at Tab 4 to SA I, 20–24.

On December 10, 1991, the single Justice (Greaney, J.) issued an order stating that he was not "persuaded by the Commonwealth's argument that the issues sought to be raised by the defendant are not 'new' for purposes of seeking an appeal pursuant to the gatekeeper provision...." Mem. and Order, attached at Tab 6 to SA I. On the record before him, however, Justice Greaney was unable to tell "whether any of the claims of ineffective assistance [were] 'substantial.'" *Id.* He therefore remanded the motion for a new trial to the trial court for an evidentiary hearing on the grounds set forth therein. *See id.*

The trial court held an evidentiary hearing over three days in May 1992. Petitioner presented nine witnesses and entered twenty-one exhibits into evidence. On August 28, 1992, Judge Tuttle again rejected Petitioner's claims, this time issuing detailed findings of fact and conclusions of law concerning their merits. *See* Mem. of Decision on Defendant's Motion for a New Trial, attached at Tab 7 to SA I ("Mem. of Decision"). The trial judge, however, did not address the question of what arguments were or could have been available to Petitioner on direct review. *See id.*

Once more, Petitioner appealed the denial of his motion for new trial to the single justice session. The Commonwealth

opposed leave to appeal, but did not seriously press its earlier claim that Petitioner's claim was not "new" within the meaning of section 33E. *See* Resp't's Second Opp'n to Leave to Appeal, attached at Tab 9 to SA I at 5 n. 2.[2] The Commonwealth instead devoted the greatest part of its opposition to arguing that Petitioner's claims were not substantial. *See id.* at 5–11. On January 7, 1993, a second single justice (O'Connor, J.) rejected Petitioner's motion for leave in a one-paragraph order, stating that he had considered the trial judge's "memorandum, the other materials in the file, and the arguments of counsel," and that "Defendant's claim of ineffective assistance of counsel does not present a 'new and substantial question which ought to be determined by the full court.'" January 7, 1993 Order, attached at Tab 10 to SA I (quoting section 33E).

Persistent in defeat, Petitioner challenged the constitutionality of section 33E's gatekeeper provision in a declaratory judgment action pursuant to Mass.Gen. Laws Ch. 231A. Attacking section 33E on Due Process grounds, Petitioner argued that the statute "denies defendants in capital cases collegial appellate review of non-frivolous constitutional claims which were not and could not have been reviewed on direct appeal." *Trigones v. Attorney General,* 420 Mass. 859, 652 N.E.2d 893, 894 (1995) (*"Trigones II"*). Petitioner also claimed that section 33E denies capital defendants equal protection because similarly situated non-capital defendants can appeal as of right to the full SJC. *See id.*

A single justice (Lynch, J.) dismissed Petitioner's complaint. Petitioner appealed to the full SJC, which also denied his claim. The SJC indicated that it would not reach Petitioner's broad Due Process challenge because Petitioner had not established the unavailability of his ineffective assistance claim before either gatekeeper justice.[3] *Trigones II,* 652 N.E.2d at 894 n. 5, 895. Accordingly, the court found that there was no reasonable distinction between his case and past challenges to section 33E. *Id.* at 895 (citing *Dickerson v. Attorney General,* 396 Mass. 740, 488 N.E.2d 757 (1986)). The court also concluded that section 33E's use of a gatekeeper to screen out questions not "new and substantial" did not violate Due Process: "The mere fact that a procedural rule was changed to the arguable detriment of some capital defendants does not 'offend some principle of justice so rooted in the tradition and conscience of our people as to be ranked fundamental.'" *Trigones II,* 652 N.E.2d at 895 (citing *Medina v. California,* 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)). The SJC described section 33E as a reasoned choice "to concentrate limited resources on the trial and appellate stages of a capital proceeding, and to restrict full court review to meritorious claims that presented 'new and substantial' issues." *Trigones II,* 652 N.E.2d at 896.

### III. ANALYSIS

On February 6, 1997, Petitioner filed his application for the writ of habeas corpus, setting forth three grounds on which he claims that he is entitled to relief.

In Ground One, Petitioner argues that he was denied the effective assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments because his trial attorney failed to make adequate pretrial investigation, waived a critical cross-examination of Roland Weed at the pre-

---

**2.** Respondent argued in a footnote that it was "doubtful" that the allegations raised by the defendant were "new" within the meaning of section 33E, as they were "certainly known, or able to be known by the defendant or his appellate counsel at the time of his direct appeal," but acknowledging that Justice Greaney "was 'unpersuaded' by the newness argument advanced by the Commonwealth before the remand." *Id.* at 5 n. 2.

**3.** The court disagrees, however, because as discussed below, the "unavailability" was never explicitly decided by either gatekeeper justice. Instead the ineffective assistance claim was addressed on the merits by Judge Tuttle, and his analysis was adopted by Justice O'Connor.

trial hearing, and presented inconsistent theories of defense at trial. *See* Petition for Writ of Habeas Corpus ("Petition") at ¶ 12A.

In Ground Two, Petitioner alleges that the trial judge improperly and prejudicially curtailed his Sixth Amendment right to cross-examine Roland Weed at a pre-trial hearing (an argument rejected by the SJC on direct appeal). *See* Petition at ¶ 12B. Petitioner also suggests that the pre-trial suppression hearing did not provide his counsel adequate motivation to develop a full cross-examination on the accuracy of Weed's account of Petitioner's inculpatory statements. *See* Preliminary Mem. of Law in Supp. of Petition for Habeas Corpus ("Pet'r's Mem.") at 28. Petitioner thus argues that the trial judge should not have admitted Weed's transcript-based testimony at trial because it did not bear "adequate indicia of reliability." *See id.* at 27–33.

In Ground Three, Petitioner contends that the Commonwealth's "gatekeeper" appellate procedure violated both the Due Process and equal protection clauses of the Fourteenth Amendment. *See* Petition at ¶ 12C.

The court addresses the final claim first.

**A. Petitioner's Due Process and Equal Protection Claims.**

Petitioner argues that the gatekeeper provision denies Due Process because it arbitrarily limits his right to collegial appellate review, and violates equal protection by irrationally distinguishing between capital and non-capital defendants. As a

preliminary matter, the court must determine whether this claim is cognizable under existing habeas corpus standards.

The passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") brought significant limitations to a petitioner's ability to pursue habeas corpus relief. *See O'Brien v. Dubois,* 145 F.3d 16, 20–21 (1st Cir.1998).[4] Section 2254(d) of the habeas statute, as amended by the AEDPA, prohibits federal courts from granting the petition of a state prisoner unless the underlying adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .

28 U.S.C. § 2254(d)(1).

In *O'Brien,* the First Circuit introduced an "independent two-step analysis" for the post-AEDPA application of section 2254(d). *Id.* at 24.[5]

First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

---

4. The AEDPA's provisions apply to Petitioner's application because he filed it after the April 24, 1996 effective date of the act. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (holding that AEDPA's amendments apply only to those noncapital habeas petitions filed after its enactment).

5. The court arrived at this approach after discussing, and expressing disagreement with, various positions adopted by other circuits. *See Id.; see, e.g., Drinkard v. Johnson,* 97 F.3d 751, 767–78 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315

(1997) (applying the "contrary to" language to issues of law and the "unreasonable application" language to mixed questions of law and fact); *Neelley v. Nagle,* 138 F.3d 917, 923–24 (11th Cir.1998) (same); *Perez v. Marshall,* 946 F.Supp. 1521, 1532–33 (S.D.Cal. 1996) (same standard of deference to both legal and mixed adjudications); *Buehl v. Vaughn,* No. 95–5917, 1996 WL 752959, at *7 (E.D.Pa. Dec.31, 1996) (petitioner retains choice of which clause petition is reviewed under, leaving "unreasonable application" language less frequently used). *Id.*

*Id.* The *O'Brien* court acknowledged that the "chief question is how specific a rule must be to qualify as dispositive, thus triggering review under the 'contrary to' clause." *Id.* To achieve "contrary to" review, *O'Brien* requires "something more than a recognition that the Supreme Court has articulated a general standard that covers the claim." *Id.* at 24–25. "The key inquiry," the court noted, "is whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identically) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for applications to variant factual situations—can be fairly said to require a particular result in a particular case." *Id.*

■ If no Supreme Court rule is sufficiently shaped to merit "contrary to" review, the First Circuit requires that the habeas court determine whether the state court's decision "appears objectively reasonable." *Id.* at 25. *See also Vieux v. Pepe,* 184 F.3d 59, 64 (1st Cir.1999) (clarifying application of the "contrary to" and "unreasonable application" prongs). In making this determination, reference to the decisions of inferior federal courts "is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue." *O'Brien,* 145 F.3d at 25. Nevertheless, a habeas court must employ an exceptionally deferential standard. "For the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Id.*

Under the *O'Brien* framework, neither Petitioner's Due Process nor equal protection claim is amenable to habeas review.

To qualify for review, Petitioner must demonstrate that his Due Process claim is either "contrary to," or involves an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As to the first prong, Petitioner effectively concedes that there is no Supreme Court precedent that "can fairly be said to require a particular result in [this] particular case." *O'Brien,* 145 F.3d at 25. Indeed, Petitioner acknowledges that the Court has never found that Due Process requires *any* appellate review. *See* Pet'r's Mem. at 35. *See also Ross v. Moffitt,* 417 U.S. 600, 606, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) (acknowledging "the traditional principle that a State is not obliged to provide any appeal at all for criminal defendants") (citing *McKane v. Durston,* 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894)). Petitioner's claim can only proceed, therefore, if the gatekeeper statute he challenges constitutes an "unreasonable application of clearly established Supreme Court jurisprudence." *O'Brien,* 145 F.3d at 25.

■ Under the applicable Due Process standard found in *Medina v. California,* 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), Petitioner must demonstrate that the Commonwealth's procedural rule " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Id.* at 445, 112 S.Ct. 2572 (quoting *Speiser v. Randall,* 357 U.S. 513, 523, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). This Petitioner cannot do. In implementing section 33E, the state legislature made a reasoned decision to allocate judicial resources in a particular way. It chose to provide capital defendants direct, plenary review of their convictions by the SJC. Having provided the right to a searching direct appeal, "[t]he gatekeeper provision merely screens out appeals that lack merit by requiring that a capital defendant obtain the approval of a single justice before appealing to the full court." *Trigones II,* 652 N.E.2d at 895. As opined in *Medina,* the Supreme Court has sought to avoid "undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." *Id.* at 443, 112 S.Ct. 2572. The deference shown by the *Medina* court towards state regulation of criminal proce-

dure, *see id.*, weighs strongly against Petitioner's assertions that the appellate rights he seeks are fundamental. Furthermore, where this circuit has found that there is no fundamental right to appellate review of the trial court's post-conviction ruling, *see Dickerson v. Latessa*, 872 F.2d 1116, 1119 (1st Cir.1989), the state's gatekeeper provision cannot be "so offensive to existing precedent ... or so arbitrary as to indicate that it is outside the universe of plausible, credible outcomes." *O'Brien*, 145 F.3d at 25.

■ Petitioner's equal protection claim is easily resolved. Petitioner argues that the gatekeeper provision of section 33E violates principles of equal protection by creating an irrational distinction between capital and non-capital defendants. *See* Pet'r's Mem. at 40–43. As discussed above, the gatekeeper statute is justified by the reasoned allocation of judicial resources. Capital defendants are given the right to a searching appeal, made directly to the SJC. The tradeoff for this allocation is that future appeals are screened by a single justice. As this circuit has already decided, a rational basis underlies section 33E, and thus Petitioner is not denied "the equal protection of the laws." *Dickerson*, 872 F.2d at 1120.

As such, Petitioner's Due Process and equal protection claims are not cognizable under habeas corpus review.

## B. Petitioner's Ineffective Assistance of Counsel Claim.

Petitioner's ineffective assistance claim is based on several alleged errors committed by his counsel, both in preparing for and conducting Petitioner's defense at trial. Petitioner alleges that counsel was deficient by: failing to interview important witnesses; failing to adequately search for the murder weapon; failing to locate or test certain crime scene evidence; presenting inconsistent theories of defense; and waiving the cross-examination of Roland Weed. The Commonwealth opposes Petitioner's ineffective assistance claim, arguing first that habeas corpus relief is un-

available because the prior state court decisions were rendered on an independent and adequate state ground, and second that Petitioner cannot meet the constitutional standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### 1. The Commonwealth's Independent and Adequate State Grounds Argument

Respondent seeks to cut-short review of Petitioner's ineffective assistance claim by arguing that the independent and adequate state grounds underlying prior state court determinations preclude this court from granting habeas relief. According to the First Circuit,

[h]abeas review is not available in federal court unless, to use the statutory term, it is review of a "claim that was adjudicated on the merits in State court proceedings." ... Such independent and adequate state grounds exists where "the state court declined to hear [the federal claims] because the prisoner failed to meet a state procedural requirement."

*Simpson v. Matesanz*, 175 F.3d 200, 205 (1st Cir.1999) (internal citations omitted) (alteration in original).

■ Here, the Commonwealth argues that Petitioner is barred from pursuing his ineffective assistance of counsel claim because that claim was denied by the SJC as procedurally barred. The Commonwealth contends that Petitioner's motion for a new trial was denied for failing to meet the statutory requirement of presenting "a new and substantial" question under Mass. Gen.Laws ch. 278 § 33E. *See* Resp't's Mem. in Opp'n to the Petition for Habeas Corpus ("Resp't's Opp'n") at 4–10. Respondent is correct that "[w]here there has been procedural waiver below, the denial of review under § 33E is an independent and adequate state ground that bars federal habeas review." *Simpson*, 175 F.3d at 206. In order to bar federal review, however, "the state decision must rest clearly

on state grounds and may not rely on mixed federal and state grounds." *Id.* at 207 (citing *Coleman v. Thompson,* 501 U.S. 722, 733–34, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)).

■ A careful review of the prior history of Petitioner's case reveals that none of the state courts that ruled upon his ineffective assistance claim based their decision upon a procedural waiver. First, following an appeal of the denial of Petitioner's motion for a new trial, the gatekeeper justice (Greaney, J.) determined that the claim was new, but that there was insufficient evidence upon which to make a determination of substantiality. *See* Dec. 10, 1991 Mem. and Order, attached at tab 6, SA I. Justice Greaney then remanded to the trial judge for an evidentiary hearing to determine whether the ineffective assistance claim possessed merit. *See id.* After an extensive hearing, the trial judge issued a detailed memorandum of decision that denied Petitioner's claims solely on the merits—Judge Tuttle made no finding that Petitioner had waived his claim. *See* Aug. 28, 1992 Mem. of Decision on Defendant's Motion for a New Trial, attached at tab 7, SA I ("Mem. of Decision"). A single Justice affirmed (O'Connor, J.), stating in a one paragraph order only that: "I have considered Judge Tuttle's memorandum, the other material in the file, and the

arguments of counsel. Defendant's claim of ineffective assistance of counsel does not present a 'new and substantial question which ought to be determined by the full court.' " [6] January 7, 1993 Order attached at tab 10, SA II (quoting Mass. Gen.Laws ch. 278, § 33E).

Nothing in these holdings indicates that Petitioner's ineffective assistance claim was decided on grounds of procedural waiver. Neither Judge Tuttle nor Justice O'Connor expressed disagreement with Justice Greaney's prior determination that Petitioner's claim was "new." Judge Tuttle's memorandum of decision following the evidentiary hearing was totally consistent with Justice Greaney's holding, denying Petitioner's claim solely on the merits. Finally, Justice O'Connor states his reliance upon Judge Tuttle's memorandum. Respondent cannot fashion a waiver of the ineffective assistance claim with only Justice O'Connor's quotation of the "new and substantial" language.[7] Because the state courts' substantive determinations necessarily resolved a constitutional issue—the effectiveness of Petitioner's counsel—there is no basis for a finding that an independent and adequate state ground existed. As such, Petitioner's ineffective assistance claim is subject to federal review.

### 2. Applying *Strickland.*

■ Petitioner's ineffective assistance claim turns on the two-prong test estab-

6. This case closely resembles the First circuit's decision in *Phoenix v. Matesanz,* 189 F.3d 20 (1st Cir.1999). There the court ruled that the gatekeeper justice had dismissed the claim on substantive grounds and not for lack of novelty. Because the justice ruled on the substance of the claim, the First Circuit determined that no independent and adequate ground existed. *See id.* at 27–28. Justice O'Connor's reliance upon the substantive determinations of Judge Greaney similarly preclude a finding that the gatekeeper Justice's denial was based on a procedural waiver.

7. It should be noted that Respondent further supports this argument by relying upon findings made by the SJC in their denial of Petitioner's constitutional challenge to Massachusetts's "gatekeeper" statute. The court there stated that "[Petitioner] has not demonstrated

(nor did any single justice conclude) that the issues raised in his new trial motion were not evident on the trial record and thus could not have been raised at that time." *Trigones II,* 652 N.E.2d at 894 n. 5. As the prior discussion indicates, this conclusion is not supported by the record.

Even if you accept the waiver finding in *Trigones II* (perhaps because Justice Greaney sat on the panel), that finding is not binding upon this court's review of the ineffective assistance claim because *Trigones II* did not decide that issue. A footnoted comment in a subsequent related action is not weighty enough to justify a finding of an independent and adequate state ground. As such this court is unpersuaded by Respondent's reliance upon the declaratory judgment determination.

lished in *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[8]

First, Petitioner must show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. This standard "demands a fairly tolerant approach," *Scarpa v. DuBois*, 38 F.3d 1, 8 (1st Cir.1994), as the Constitution does not guarantee "a letter-perfect or a successful defense." *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir.1991). Moreover, "the performance standard is not to be applied in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." *Id.* Finally, "a reviewing court must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Scarpa*, 38 F.3d at 8 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

Even if Petitioner can show, despite this presumption, that counsel's performance fell outside the wide range of reasonable professional assistance, *Strickland's* second prong requires that he demonstrate that counsel's performance prejudiced him. *Id.* at 694, 104 S.Ct. 2052. To do this, Petitioner must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id. See also Scarpa*, 38 F.3d at 16. This determination "does not focus solely on outcome determination, but also takes into prominent consideration 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Id.* at 16 (*quoting Lockhart v. Fretwell*, 506

U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

The court explores each of Petitioner's individual claims to determine whether they satisfy the constitutional standards set forth in *Strickland.*

### a) Failure to interview Kapalas and Bell.

Petitioner alleges that his counsel failed to provide adequate representation by neglecting to interview three potential alibi witnesses. Petitioner asserts that the first two witnesses, Gary Kapala and Mary Kapala ("the Kapalas"), would have testified that Petitioner stopped in a bar called the Copper Kettle at 12:30 a.m. on the morning of the murder. The third witness, Linda Bell, would have testified that Petitioner stopped in an establishment called the Blue Moon sometime after it closed at 1:00 a.m. Petitioner argues that the failure to interview and present these witnesses constituted deficient representation because their testimony would have corroborated Petitioner's defense at trial. *See* Pet'r's Mem. at 18–23.

■ "The decision to interview potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case." *Lema v. United States*, 987 F.2d 48, 55 (1st Cir.1993). To resolve this question the court must make " 'every effort ... to eliminate the distorting effects of hindsight' and to evaluate counsel's conduct from his or her perspective under the circumstances as they existed at that time." *Matthews v. Rakiey*, 54 F.3d 908, 916 (1st Cir.1995) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052) (alterations in original).

---

8. As discussed above, in order to qualify for habeas relief Petitioner must satisfy one of the standards set forth in *O'Brien*. The first inquiry—the "contrary to" prong—can be met where general rules laid out by the Supreme Court "sufficiently shape the contours of an appropriate analysis of a claim of constitutional error." *Id.*, 145 F.3d at 25. The *O'Brien* court further noted that such a gener-

al rule has been constructed for resolution of ineffective assistance claims. *See id.* at 25 n. 6 (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). For Petitioner to succeed, therefore, he must show that the state courts' disposition of his ineffective assistance claim were "contrary to" the Supreme Court's standard for measuring ineffective assistance of counsel.

█ Here, trial counsel's decision not to interview the Kapalas and Bell was an informed and strategic one. Attorney Delinsky testified at the evidentiary hearing that he chose not to pursue the Kapalas and Bell because their testimony would have, at best, created a floating alibi that failed to cover the entire period of time during which the murder could have occurred (12:30–2:30 a.m.). *See* Tr., May 15, 1992 Hr'g at 2–20. Delinsky instead focused the defense on the fact that one of the Commonwealth's key witnesses, Allen Bunker, heard a scream at approximately 1:30 a.m., and that Petitioner had a solid alibi as late as 1:25 a.m. Counsel thus contemplated the potential benefit of presenting the floating alibi that Petitioner now advocates, but chose to base his defense on the solid alibi existing close to the presumed time of the murder.[9] This strategic decision was a reasonable one, even if it did not succeed. *See* 938 F.2d at 310 (strategic decision reasonable, despite lack of success); *Lema*, 987 F.2d at 55 (strategic decision reasonable where counsel balanced benefits and risks). *Compare Chambers v. Armontrout*, 907 F.2d 825, 831 (8th Cir.1990) (failure to investigate and call witness who could support defendant's *only* defense was unreasonable).

█ Even if the failure to interview the Kapalas and Linda Bell somehow fell outside the reasonable range of professional assistance, Petitioner cannot, under the second prong of *Strickland*, show prejudice from these failures. The critical interval in this case was the time of the murder, which the medical examiner placed between 12:30 and 2:30 a.m. In addition, Bunker's testimony made 1:30 the most pivotal moment inside this interval. The Kapalas' proposed testimony that Petitioner was at the Copper Kettle between 12:00 and 12:30 a.m. provided no information about the critical interval that followed. To the extent Petitioner argues that Mary Kapala's testimony would have corroborated Petitioner's version of events, the trial court reasonably concluded that her testimony (that Petitioner was looking for Trzcinski at the Copper Kettle) actually would have contradicted elements of Petitioner's testimony. *See* Mem. of Decision at 37.

As for Linda Bell, she testified at the new trial hearing that Petitioner entered the Blue Moon Bar "after closing" to patrons, which was usually at 1:00 a.m. *See* Tr., May 14, 1992 Hr'g at 30. On cross-examination, Bell admitted that "it could have been fifteen minutes before, fifteen minutes after." *See id.* at 37. The trial judge concluded on that record that Petitioner came in "shortly after closing."[10] Mem. of Decision at 11, 38. Had Bell testified at trial, her testimony would have conflicted with the testimony of Petitioner's girlfriend, Sharon Leo; her son, Bobby; Barbara Gomache; and Petitioner himself—all of whom placed Petitioner somewhere other than at the Blue Moon Bar as 1:30 a.m. approached. Further, there is no basis in the record for Petitioner's claim that he entered the bar as late as 2:00 or 2:30 a.m. Bell's testimony would have created just the kind of "floating alibi" that Petitioner's counsel concluded

9. Petitioner argues that his counsel's performance was additionally deficient because he questioned the veracity of Alan Bunker during his closing arguments, thus undermining the evidence placing the murder at 1:30 a.m. (and the rational for not interviewing the Klapas or Bell). Taken in its full context, however, these statements did not amount to the inconsistent defense Petitioner claims. Rather, counsel's closing discussion of Bunker's testimony was part of a general attack on the Commonwealth's conflicting accounts of Petitioner's whereabouts on the night of the crime. *See* Trial Tr., Feb. 9, 1984, Docket 31 at 37–39. To the extent that that approach contradicted the strategic decision to secure an alibi as close as possible to 1:30 a.m., Petitioner fails to demonstrate sufficient prejudice.

10. After reviewing Bell's testimony, the court disagrees with Petitioner's argument that this conclusion is "patently contradicted by the transcript of the testimony." Petitioner's Response to Resp't's Opp'n at 32 n. 1. Under AEDPA's section 2254(e)(1), state court findings of fact are conclusive unless clearly erroneous.

was of no use to Petitioner. Accordingly, counsel's failure to interview and call Linda Bell did not prejudice Petitioner.

b) Search for the Murder Weapon.

■■ Petitioner argues that counsel failed to make an adequate search for the murder weapon after Petitioner told him where it could be found. The trial judge found that counsel and/or an associate had searched systematically for the knife for at least 7.5 hours after their October 9, 1983 meeting with Petitioner. *See* Mem. of Decision at 12–13, 40. The trial judge's finding of fact cannot be disturbed unless clearly erroneous. *See* 28 U.S.C. § 2254(e)(1). Petitioner's only basis for questioning the trial judge's conclusion is that counsel did not have written documentation of all 7.5 hours spent searching for the knife. This is insufficient. As such, Petitioner cannot show that counsel's search efforts were unreasonable.[11]

■■ To the extent that Petitioner argues that the search efforts were insufficient because counsel delayed his search until October, that argument also fails. The decision to delay the search for the weapon was a perfectly reasonable one. Petitioner had given counsel conflicting accounts of his involvement in the crime, and counsel therefore was concerned that locating the weapon would obligate its disclosure to the Commonwealth, and perhaps further implicate Petitioner. *See* Tr. May 15, 1992 Hr'g at 2–16 – 2–18. Counsel thus made a reasonable strategic decision to hold-off searching for the knife until Petitioner disclosed his complete story.[12]

c) Other Missing Evidence.

Petitioner further argues that his counsel unreasonably failed to locate or independently test certain crime scene evidence, including clothing taken by

Trzcinski on the day of the murder and a fingerprint report. There is no merit to this claim.

■■ In any criminal trial, counsel must make strategic decisions on how to allocate resources. "Counsel need not chase wild factual geese" where trial strategy utilizes "informed professional judgment...." *Cepulonis v. Ponte,* 699 F.2d 573, 575 (1st Cir.1983). Here, counsel chose to mount a defense based on the possibility that Trzcinski was the actual murderer. As part of this strategy, Petitioner argued that the police conducted a shoddy investigation of the crime. Attorney Delinsky thus argued that the stolen clothing was further evidence of Trzcinki's jealousy, and that unaccounted-for crime scene evidence suggested that the police neglected to exhaust the possibility that Trzcinski was the killer. *See* Tr., Feb. 9, 1983 at 14–21. Trzcinski, however, admitted both to removing the items of clothing and to his presence at the crime scene. Petitioner, therefore, had nothing to gain by locating the missing clothing or proving that Trzcinski's fingerprints were in the house. Counsel instead used the absence of the clothing and the Commonwealth's failure to compare Trzcinski's prints to argue that the police failed to perform a thorough investigation. This was part of an overall strategy to shift the blame for the murder to Trzcinski. The court is unpersuaded by Petitioner's attempt to question counsel's decision with the benefit of hindsight.

■■ Even if counsel had an obligation to conduct a more thorough investigation, moreover, Petitioner presents no evidence to meet the prejudice prong of *Strickland.* At best, the "missing" evidence would have shown Trzcinski's presence at the scene of the murder; yet, the jury already had ample evidence of this fact.[13]

---

**11.** Petitioner makes no argument that a search of 7.5 hours was itself insufficient.

**12.** Because Petitioner has failed to show that the counsel was deficient in searching for the knife, the court need not consider the prejudice prong as related to this claim.

**13.** Petitioner also argues that counsel unreasonably failed to cross-examine Trzcinski on the presence of blood on his hands, arms, and truck. There was ample evidence as to this fact, despite any failure to cross examine, and counsel persuasively argued that evidence in

d) Waived Cross Examination of Roland Weed.

Finally, Petitioner argues that his counsel was deficient in waiving his cross examination of Roland Weed during the pretrial suppression hearing. During that hearing, Attorney Delinski sought the suppression of the confession Petitioner allegedly made to Weed. According to Delinski, he chose to limit his cross examination of Weed because he did not want to disclose his trial strategy to the government.[14] Petitioner asserts that counsel's decision to limit the examination was unreasonable because counsel erroneously believed that Weed could not invoke his Fifth Amendment privilege because of immunity under Mass.Gen.Laws Ch. 274, § 4. There is no support for this assertion.

 Delinski's decision to waive cross examination of Weed was based, not upon a misunderstanding of the law, but upon strategic grounds. During the hearing on Petitioner's motion for a new trial, Attorney Delinski testified that he believed that Weed would willingly testify at trial, and that regardless, he thought any Fifth Amendment privilege had been waived during Weed's Grand Jury testimony. *See* Tr., May 15, 1992 Hr'g at 2–52. Delinski's testimony does not support the altogether different conclusion that Weed could *not* invoke his Fifth Amendment because of an erroneous interpretation of Chapter 274. Furthermore, Delinski's reliance on a presumed Fifth Amendment waiver was not unreasonable. Indeed, Judge Tuttle held Weed in contempt during the trial, finding

that such a waiver occurred. This was a reasonable conclusion on both Judge Tuttle's and Attorney Delinski's part, as Weed had signed a Miranda waiver card prior to his grand jury testimony.[15] As Delinski testified extensively, he chose to cut-short his cross examination because he did not want to disclose his trial strategy to the Commonwealth. *See* Tr., May 14, 1992 Hr'g at 200–201. This was a reasonable strategy in light of the belief that Weed had waived his Fifth Amendment privilege. As such, Petitioner cannot show that counsel's waiver of the cross-examination of Weed constituted ineffective assistance.

For the foregoing reasons, Petitioners' ineffective assistance claim fails.

C. Petitioner's Right to Confrontation Claim.

Petitioner's Sixth Amendment confrontation claim argues that the trial judge improperly admitted the prior recorded testimony of Roland Weed.[16] This claim is significant, as the admission of Weed's testimony recounting Petitioner's alleged confession was likely some of the most damning evidence. Weed stated during the suppression hearing that "the [Petitioner] had told him that he had done 'something terrible,' that there was 'a lot of hate' in him and that he guessed that 'if it wasn't her, it would have been somebody else.'" *Trigones I*, 492 N.E.2d. at 1148. As the SJC noted in Petitioner's direct appeal, "if this evidence was not admissible, quite obviously its admission constituted reversible

his closing. *See* Tr., Feb. 8, 1993 at 14–17. As with the "missing" evidence, Petitioner does not show that any prejudice resulted.

**14.** Counsel intended to show that Petitioner had confessed to helping Trzcinski after the fact, not to committing the crime himself.

**15.** That the Appeals Court ultimately overturned Judge Tuttle's contempt order, *see Commonwealth v. Weed*, 17 Mass.App.Ct. 463, 459 N.E.2d 144 (1984), does not render the conclusion unreasonable. The Appeals Court's conclusion that a waiver did not occur was based on their finding that subse-

quent comments by the prosecutor negated the prior waiver. *See id.*

**16.** Once again (and as discussed above), in order to qualify for habeas relief Petitioner must satisfy one of the standards set forth in *O'Brien v. Dubois*, 145 F.3d 16 (1st Cir.1998). As with Petitioner's claim of ineffective assistance, the court determines that his confrontation clause claim falls within the "contrary to" prong because the general rules laid out by the Supreme Court "sufficiently shape the contours of an appropriate analysis of a claim of constitutional error." *Id.* at 25.

error." *Id.* The SJC concluded, however, that Weed's transcript testimony was properly admitted, first because Petitioner's counsel waived his cross examination of Weed, and second because the prior recorded testimony satisfied the constitutional requirements of *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See Trigones I*, 492 N.E.2d at 1149–50.

■ The confrontation clause of the constitution operates in two distinct ways to limit the admissibility of hearsay declarations. *See Roberts*, 448 U.S. at 65, 100 S.Ct. 2531. First, the declarant must be unavailable. *See id.* In this case that requirement was met by Weed's successful invocation of his Fifth Amendment privilege. Second, the court must insure that the hearsay statement contains adequate "indicia of reliability." *Id.* at 66, 100 S.Ct. 2531. In applying this "indicia of reliability" test, the Court has concluded that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception."[17] *Id.* Here, the testimony of Roland Weed was admitted as prior recorded testimony, and Petitioner must therefore show that admission under that hearsay exception was in error.

According to the Supreme Court, the primary constitutional requirement for the admission of prior recorded testimony is the opportunity to cross-examine the declarant during that testimony. *See Rob-*

*erts*, 448 U.S. at 70. The Court declined to hold that opportunity alone is sufficient, instead concluding in *Roberts* that opportunity, and the equivalent of a significant cross-examination, satisfied the petitioner's confrontation rights. *Id.* Here, Petitioner essentially makes two arguments as to why the trial court improperly admitted Weed's prior recorded testimony.

First, Petitioner asserts that the trial judge wrongly denied him the opportunity to cross-examine Roland Weed on the issue of his bias towards the Commonwealth (resulting from the Commonwealth's threat of prosecution). As to this argument, the SJC concluded that Petitioner was not foreclosed from examining Weed on the issue of bias; rather, Petitioner's counsel was asked by the trial judge what its relevance was and counsel abandoned this line of questioning. *Trigones I*, 492 N.E.2d at 1150. Under AEDPA, this court is bound by the state court's factual conclusion unless it is clearly erroneous. *See* 28 U.S.C. § 22554(e)(1). Petitioner fails to meet this standard.[18] As such, there is no grounds to find that Petitioner was denied the opportunity to cross-examine Weed on the issue of bias.

■ Petitioner's second argument is that the transcribed testimony lacked "adequate indicia of reliability" because Petitioner did not possess the same motive to cross-examine Weed in the suppression hearing as he would have at trial. Specifi-

---

17. Where no exception exists, "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*

18. The significant colloquy was as follows:

DEFENSE COUNSEL: "Were you told that by the District Attorney?"
THE JUDGE: "Now wait ... please. Let's assume that all of this happened that you're asking him. What relevance does it have to this hearing?"
DEFENSE COUNSEL: "I'll go on."
DEFENSE COUNSEL: "Now,—"
THE JUDGE: "No, I mean tell me. What relevance does it have? The only thing that I've got to decide in this is was his state-

ment that of a rational intellect and I'm going to let the jury listen."
DEFENSE COUNSEL: "I agree."
THE JUDGE: "And what he told his wife and what his wife did or what he did has got absolutely nothing to do with this hearing. Now when we get in front of the jury as to what caused him to make this statement, that's a different story. I'm not going to stop you there."
DEFENSE COUNSEL: "Okay, thank you."
Judge Tuttle could not be said to have foreclosed the question of bias where Petitioner's counsel did not actively pursue it. Counsel failed to explain the relevance of his question, and if he believed that the judge was foreclosing that topic, he failed to enter a formal objection.

cally, Petitioner contends that he had no motive to question Weed on the guilt or innocence of Petitioner (whether he was confessing that he committed the murder, or only helped Trzcinski), but only those grounds relevant to the suppression of the alleged confession. Petitioner made a similar argument on direct appeal, stating that he

> did not have a similar motive to cross-examine the witness at the earlier hearing as he would have had at trial, where the issues would be much broader, including at a minimum, whether or not Mr. Weed was testifying as he was in order to avoid the criminal prosecution of himself and his wife which the police had threatened.

Brief for the Def. on Appeal from the Middlesex County Superior Ct., attached at tab 1 RSA VII ("Appellate Brief"), at 47. Thus, on appeal Petitioner argued that he did not possess the same motive to cross-examine Weed regarding his alleged bias towards the Commonwealth, *see* Appellate Br. at 46–49, while he now argues that he did not have the same motive to cross-examine Weed regarding Petitioner's actual guilt or innocence. *See* Pet'r's Mem. at 27–28. Petitioner provides no explanation for failing to make this latter argument on appeal, despite the fact that counsel made a similar argument in his closing statement at trial. *See* Feb. 9, 1984 Tr. at 26–30.

■ This circuit has held repeatedly that "[i]n order to present a federal claim to the state courts in a manner sufficient to satisfy exhaustion concerns, a petitioner must inform the state court of *both the factual and legal underpinnings of the claim.*" *Scarpa v. DuBois,* 38 F.3d 1, 6 (1st Cir.1994) (citing *Picard v. Connor,* 404 U.S. 270, 276–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)) (emphasis added). *See also Nadworny v. Fair,* 872 F.2d 1093, 1101 (1st Cir.1989); *Gagne v. Fair,* 835 F.2d 6, 7 (1st Cir.1987). Substantive changes to the habeas statute under AEDPA have not altered this exhaustion requirement. *See* 28 U.S.C. § 2254(b), (c). Thus, "[w]hile the facts and legal theories need not be propounded in precisely the same terms, fair presentation requires that the constitutional analysis necessary to resolve the ultimate question posed in the habeas petition and in the state court proceeding, respectively, be substantially the same." *Scarpa,* 38 F.3d at 6. Here, Petitioner plainly failed to raise the "guilt or innocence" argument before the SJC. The court there noted that "defendant's sole argument is that Weed's testimony lacked reliability because he was not fully cross-examined on the possibility that he may have lied in order to protect his wife and himself from prosecution as accessories to the crime." *Trigones I,* 492 N.E.2d at 1150. As such, the second basis for Petitioner's sixth amendment claim fails for lack of exhaustion.

Because Petitioner neglected to present the "guilt or innocence" argument on direct appeal, that argument must fail here for lack of exhaustion. As such, Petitioner's confrontation clause claim also fails.

## V. CONCLUSION

For the reasons discussed above, Petitioner has advanced no theory under which habeas corpus relief is available. His petition is therefore DENIED.